UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KELLY BUCHANAN,<br><br>    Plaintiff,<br><br>v.<br><br>MASSACHUSETTS DEPARTMENT<br>OF CORRECTION,<br><br>    Defendant. | Civil Action No.<br>23-10192-FDS |

# MEMORANDUM AND ORDER ON
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is a dispute arising out of the Commonwealth of Massachusetts' mandatory COVID-19 vaccination policy for state executive-branch employees.

Defendant Massachusetts Department of Correction (the "DOC") implemented a policy in August 2021 that required its employees to be vaccinated against COVID-19. The policy included provisions for medical or religious exemptions under certain circumstances, as permitted under state law.

In September 2021, plaintiff Kelly Buchanan, a correctional program officer employed by the DOC, submitted a request for a religious exemption from the vaccine requirement. After multiple rounds of review by both the DOC and the Executive Office of Public Safety and Security ("EOPSS"), the DOC denied her exemption request. Because she refused to comply with the vaccine mandate even after her exemption request had been denied, the DOC terminated her employment in December 2021.

Plaintiff contends that as a Christian, she would violate her faith by accepting a COVID-19 vaccine. In support of her position, she also challenges the efficacy of COVID-19 vaccines in preventing the spread of the disease. The complaint alleges that plaintiff was a victim of religious discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a).

For the following reasons, defendant's motion for summary judgment will be granted.

## I.    Background

The following facts are undisputed unless otherwise noted.

### A.    Factual Background

#### 1.    Parties

The Massachusetts Department of Correction is an agency of the Commonwealth of Massachusetts that oversees the state prison system.

Kelly Buchanan is a former employee of the DOC. She worked as a correctional program officer from 2011 until her termination in 2021. In the period leading up to her termination, she worked at the Massachusetts Treatment Center in Bridgewater, Massachusetts. (Def.'s Statement of Undisputed Facts ["Def.'s SOF"] ¶ 60).

#### 2.    COVID-19

COVID-19 is a contagious viral disease that can cause serious illness and death. As of this writing, more than 1.2 million people in the United States have died from COVID-19. CTRS. FOR DISEASE CONTROL AND PREVENTION, PROVISIONAL DEATH COUNTS FOR COVID-19 (2024) (last updated November 23, 2024). COVID-19 is particularly dangerous for the elderly, and for people with lung conditions; heart disease; brain and nervous system conditions; diabetes; obesity; cancer; certain blood disorders; a weakened immune system; chronic kidney or liver diseases; and Down syndrome. MAYO CLINIC, COVID-19: WHO'S AT HIGHER RISK OF SERIOUS SYMPTOMS? (July 21, 2023).

The first known case of COVID-19 occurred in December 2019.  *See* WORLD HEALTH ORG., ARCHIVED: WHO TIMELINE – COVID-19 (Apr. 27, 2020).  By March 2020, it had spread into a worldwide pandemic.  *Id.*

### 3.     **The COVID-19 Vaccination Policy**

In August 2021, the DOC implemented a policy for COVID-19 immunization to conform with Executive Order 595 ("EO 595"), which required all Massachusetts executive-branch employees to "demonstrate no later than October 17, 2021 . . . that they have received COVID-19 vaccination." (Compl. Ex. 1 at 2).  The order permitted "limited exemptions from the vaccination requirement where a reasonable accommodation [could] be reached for any employee who is . . . unwilling to receive COVID-19 vaccination due to a sincerely held religious belief." (*Id.* at 2-3).  The order also included guidance for appropriate enforcement of the vaccine requirement, including "progressive discipline up to and including termination for non-compliance." (*Id.* at 3).

Before EO 595, the DOC had instituted several measures recommended by the Centers for Disease Control ("CDC") and required by the Massachusetts Department of Public Health ("DPH") to reduce the rate of COVID-19 transmission, such as masking, social distancing, and regular testing of the virus. (Def.'s SOF ¶ 38).  In addition, it suspended visitation to its facilities and implemented quarantine and medical isolation protocols to minimize COVID-19 transmission at its facilities. (*Id.* ¶ 40).  However, despite these measures, by the fall of 2021, it faced significant staffing shortages, due in part to the spread of COVID-19 among its employees, requiring the agency to pay overtime to the limited correctional staff available to work. (*Id.* ¶ 47).

### 4.     Plaintiff's Request for an Exemption

In September 2021, Buchanan submitted a request for a religious exemption from the vaccination requirement of EO 595.  (*Id.* ¶ 66).  The request included a personal statement, stating in relevant part that "[b]eing forced, pressured, intimidated or coerced to ingest or receive any substance into my body that clearly violates my conscience, or my personal practice of faith, or that contextually violates the Holy Scripture which I hold sacred in my heart cannot be adhered to."  (Def.'s SOF Ex. 7 at 5).  Her written request included no additional detail elaborating on the specific nature of her religious beliefs or the tenets of her faith that prohibit ingestion of the COVID-19 vaccine.

As part of her exemption request, Buchanan sought an accommodation under which she would continue wearing personal protective equipment ("PPE") such as masks, and testing for COVID-19 as required.  (*Id.*).

### 5.     Defendant's Denial of the Exemption Request

In November 2021, the DOC denied Buchanan's exemption request on the grounds that (1) she had failed to articulate a religious belief that conflicts with the vaccination requirement and (2) her requested accommodation would cause undue hardship for the DOC.  (Compl. ¶ 11).

To evaluate such employee exemption requests, the DOC—under the direction of Massachusetts' Human Resources Division ("HRD")—developed a formal review process in the fall of 2021.  (Def.'s SOF ¶ 28).  The review process consisted initially of an assessment conducted by the DOC Office of Diversity and Equal Opportunity, during which the DOC's Director of Diversity gathered information concerning the employee-applicant's exemption request and job responsibilities.  (*Id.*).  The DOC Director of Diversity, Carol Thomas, discussed with Buchanan her exemption request, job duties, proposed accommodations, and vaccine history.  (*Id.* ¶ 57).

In October 2021, HRD revised the review process to create a three-member panel consisting principally of DOC employees (the "DOC Panel") to conduct the initial review of exemption requests and gather additional relevant information. (*Id.* ¶ 58). As part of its revised procedures, HRD also established a second panel under the EOPSS (the "EOPSS Panel") to review the DOC Panel's findings and determinations. Thus, three sets of reviewers—Thomas, the DOC Panel, and the EOPSS Panel—considered Buchanan's religious-exemption request before collectively denying it in a letter dated November 1, 2021. (Compl. ¶ 11).

A key consideration in the reviewers' analysis of the requested exemption was the nature of Buchanan's work and responsibilities as a correctional program officer. (Def.'s SOF ¶ 69). Buchanan worked at a congregate-care facility and was tasked with providing various forms of treatment, counseling, and rehabilitation to the prisoners. (*Id.*). Her mandatory duties included visiting the incarcerated housing unit several times per week, conducting face-to-face interviews, dealing with reentry-related matters, and more. (*Id.* ¶ 61). Essentially, her job responsibilities required her to operate in proximity with incarcerated individuals and other staff members on a day-to-day basis. (*Id.*).

Accordingly, in the reviewers' estimation, the requested accommodation of masking and testing without vaccination would not adequately protect the people Buchanan encountered in her role at the DOC. Exempting her would require the DOC to reassign her work to other staff members. (*Id.*). Thus, according to the DOC, the requested accommodation could not be made without "undue hardship," and the request was denied. (Compl. ¶ 11).

### 6. **Plaintiff's Termination**

On November 2, 2021, the DOC suspended Buchanan for five days for failing to comply with its vaccination policy. (Compl. ¶ 12). On December 10, 2021, it suspended her for another

5

ten days for the same reason. (*Id.*). It then terminated her employment on December 24, 2021, for continuing to violate the vaccination policy. (*Id.* ¶ 13).

B.  **Procedural Background**

On January 27, 2023, plaintiff brought this suit against the DOC.[1] The complaint alleges religious discrimination under Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). Defendant has moved for summary judgment, contending both that plaintiff has failed to establish a *prima facie* case of religious discrimination and that the requested accommodation would have resulted in undue hardship.

II.  **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v.*

---

[1] Plaintiff previously filed a charge with the Equal Employment Opportunity Commission ("EEOC"), which issued a Right to Sue notice on November 8, 2022. (Compl. ¶ 5).

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### III.    Analysis

#### A.    Religious Discrimination

As relevant here, Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). Under the statute, "religion" is defined to "include[ ] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

The First Circuit "appl[ies] a two-part framework in analyzing religious discrimination claims under Title VII." *Lowe v. Mills*, 68 F.4th 706, 719 (1st Cir. 2023) (quoting *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 12 (1st Cir. 2012)). "First, [a] plaintiff must make her *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action." *Id.* (quoting *Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004)). "[T]he burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship." *Cloutier*, 390 F.3d at 133.

Defendant asserts (1) that plaintiff has failed to establish a *prima facie* case of religious discrimination and (2) that the requested accommodations would have resulted in undue hardship.

7

Here, the Court need not determine whether plaintiff has established a *prima facie* case because, even assuming she has, her claim fails at the undue-hardship stage. *See, e.g.*, *Isaac v. Exec. Off. of Health & Hum. Servs.*, 2023 WL 8544987, at *2 (D. Mass. Dec. 11, 2023).

### B.     Undue Hardship

In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court stated that an accommodation poses an undue hardship "when [the] burden is substantial in the overall context of an employer's business." 600 U.S. at 468. The undue-hardship inquiry takes a "common-sense" approach, *id.* at 571, and "must take into account the context of the particular employer's business and the nature of operations. . . . Considerations include not only direct economic costs, but indirect ones related to health and safety," *Antredu v. Massachusetts Dep't of Youth Servs.*, 2024 WL 1539725, at *5 (D. Mass. Apr. 9, 2024) (quoting *Together Emps. v. Mass General Brigham, Inc.*, 573 F.Supp.3d 412, 440 (D. Mass. 2021)).

Relevant factors include the employer's legitimate safety concerns and whether the accommodation requires the employer to "relieve an employee of her essential job functions and assign them to another employee." *Id.* (citations omitted). "Moreover, in determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation." *Together Emps.*, 573 F. Supp. 3d at 437 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 n.15 (1977)).

Defendant contends that "permitting [p]laintiff to go unvaccinated at the height of the pandemic would have substantially burdened [the] DOC's operations and caused it undue hardship." (Mot. Summ. J. at 11). Based on the undisputed evidence, the Court agrees.

Exempting plaintiff from the vaccine mandate would have limited her ability to perform her job and posed heightened health risks to those around her, thereby disrupting defendant's overall staffing and programming operations. Plaintiff's primary job responsibilities as a

correctional program officer consisted almost entirely of in-person interactions, including maintaining the care and treatment services for incarcerated individuals, observing their conduct, conducting face-to-face interviews, attending rounds of correctional-facility housing units multiple times per week, providing in-person counseling, and collaborating with other staff members on-site. (Def.'s SOF ¶¶ 61, 69). She did not request an accommodation to work remotely, and for good reason: she could not have reasonably performed her job duties from afar.

However, even her requested accommodations—to wear PPE and submit to regular testing—would have posed an undue burden on her employer. The FDA approved the COVID-19 vaccine for immunization to prevent a communicable disease. (Opp. Ex. B at 12). Based on information available at the time, the vaccine was shown to be more effective than non-pharmaceutical interventions in reducing COVID-19 health risks. Thus, without the vaccine, plaintiff posed a heightened health risk to her colleagues and the incarcerated population with whom she interacted as part of her job on a regular basis.

Defendant had a very substantial interest in preventing outbreaks of COVID-19 in its facilities. The prevailing policies at the time required staff members to isolate medically if exposed to the virus. As a result, any exposure to the virus among DOC personnel temporarily reduced the available staffing and, consequently, the services that the agency could provide. And in fact, by the fall of 2021, defendant did face severe staffing shortages, due in part to COVID-19 infections among its personnel and the corresponding mandatory isolation periods, (Def.'s SOF ¶ 49), requiring the agency to pay overtime rates to available correctional officers to backfill the vacancies, (*id.* ¶ 47). Similarly, prisoners exposed to the virus had to isolate in restricted areas of defendant's facilities, curtailing the rehabilitative programs overseen by the

correctional program officers and forcing the agency to make changes to its staffing assignments to ensure that those exposed individuals abided by the facility's isolation policies. (*Id.* ¶¶ 44-45). And, of course, outbreaks of COVID-19 in correctional facilities pose substantial health and safety risks to the prisoners, who are there involuntarily and cannot isolate themselves.

Accordingly, in an effort to mitigate the economic, operational, and health-related impacts of COVID-19 infections, the agency implemented a policy pursuant to EO 595 requiring that all personnel receive the COVID-19 vaccine. (Compl. Ex. 1 at 2). Granting plaintiff's exemption would have undermined the policy by both increasing her risk of infection—which would require defendant to reallocate her work to others—and increasing others' risk of exposure (and, as a result, medical isolation), creating staffing and operational burdens for defendant.

Plaintiff has offered little to challenge the notion that infections in her workplace would cause legitimate hardship on defendant's operations. Instead, she contests the efficacy of the COVID-19 vaccine in reducing risk of infection. (Opp. at 6-8). Plaintiff cannot, however, simply follow her own idiosyncratic views with respect to that issue; that is a decision committed to those charged with administering the DOC.

In any event, there is no record evidence that would allow a reasonable juror to find in favor of plaintiff on the efficacy of the vaccine. Plaintiff first contends that the FDA "did not approve the vaccines for the prevention of infection or transmission of the virus." (*Id.* at 7). As support, she points to an excerpt from a statement by the FDA's Chief Scientist that the "COVID-19 [v]accine may be effective in preventing COVID-19," a claim that plaintiff believes "do[es] not convey a great deal of certainty." (*Id.*).

However, in parts of the statement omitted by plaintiff, the FDA repeatedly confirms that the vaccine was authorized "for the prevention of COVID-19" and "for active immunization to prevent COVID-19." (Opp. Ex. A at 2). Plaintiff does not refute or even address those other sections of the statement, and the Court has no reason to doubt the FDA's stated purpose for authorizing the vaccine.

Plaintiff next points to a portion of a separate letter from the FDA suggesting that the vaccine does not protect against infection with the SARS-CoV-2 virus. (Opp. Ex. B at 12-13). Her argument echoes one previously presented in this jurisdiction in a similar case. *See Isaac*, 2023 WL 8544987, at *2.

As with the plaintiff in *Isaac*, plaintiff here does not engage with the rest of the FDA's letter, which as a whole reveals that the FDA was simply clarifying that the vaccine was "designed to prevent infection with the *disease* caused by the SARS-CoV-2 virus, not infection with the virus itself." *Id.* (emphasis in original). Reading the FDA's statement in its entirety therefore affirms, rather than undercuts, defendant's position that the vaccine would help provide effective protection against COVID-19 among its staff.

Finally, largely repeating arguments made in her motion to strike,[2] plaintiff contends that a genuine dispute exists as to the efficacy of the vaccine because of supposed deficiencies in the testimony of defendant's expert, Dr. Lawrence Madoff. Specifically, plaintiff's opposition brief makes the following claim:

> Defendant's expert is not able to determine the absolute risk reduction of the COVID-19 vaccines, not able to determine the length of time a category of vaccine may protect a single individual from infection by COVID-19, and not able to determine the amount of time a category of vaccine may prevent a single individual from transmitting COVID-19 to another individual.

---

[2] The Court denied plaintiff's motion to strike in a written memorandum and order issued on September 16, 2024. (ECF No. 29).

11

(Opp. at 8).

On closer inspection, however, Dr. Madoff's testimony would not leave a reasonable juror in doubt about the efficacy of the vaccine. At various points, for example, he responds to hypothetical questions about an individual's absolute risk by explaining that such risk is measured at a population level, not an individual level. (Mot. Strike Ex. A at 102:6-18, 20-24; 103:1-8). Moreover, plaintiff's criticism of Dr. Madoff's testimony does not include any scientific evidence refuting the efficacy of the vaccine at reducing the health risks of COVID-19. At most, she notes that "11.4% of fully vaccinated people have caught COVID-19" in Massachusetts, but does not provide comparative data for unvaccinated populations. (Opp. at 10). And regardless of Dr. Madoff's ability to verify certain risk and transmission statistics in his deposition, data publicly available at the time of EO 595's enactment established that the vaccine was effective in reducing infection and transmission rates of COVID-19. (Def.'s SOF Ex. 1 ¶¶ 20, 25, 26).

Thus, plaintiff does not raise a genuine dispute of material fact as to whether granting her an exemption to the vaccine mandate would cause an undue burden on defendant. The Court will therefore grant defendant's motion for summary judgment.

### IV.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  December 23, 2024          Chief Judge, United States District Court